IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WILLIAM M. WATTS,

                        Plaintiff,

    v.                                              OPINION and ORDER

MARK KIDMAN and BRAZOS URETHANE, INC.,            18-cv-49-jdp

                        Defendants.

---

Pro se plaintiff William M. Watts alleges that he was injured after being sprayed in the face with a roof-priming chemical used by a contractor at the Federal Correctional Institution in Oxford, Wisconsin, where Watts was incarcerated. He is proceeding on Eighth Amendment and negligence claims against Mark Kidman, a privately employed optometrist who provided eye care to him, and on negligence claims against Brazos Urethane, Inc., the construction company that used the chemical primer.[1]

Before the court is Watts's renewed motion for assistance in recruiting counsel, Dkt. 115, which I will deny. Also before the court are motions for summary judgment filed by Kidman, Dkt. 103, and Brazos Urethane. Dkt. 117. In considering defendants' motions, I must view the evidence in the light most favorable to Watts. But even with this perspective, Watts has failed to adduce evidence that either defendant acted negligently. Watts cannot maintain a constitutional claim against a federal contractor, so I must dismiss his Eighth Amendment claim against Kidman. Defendants' motions will be granted.

---

[1] Watts's is proceeding on FTCA claims arising out of the same incident against several government defendants in a separate lawsuit, case number 19-cv-841-jdp.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

From 2014 to 2018, plaintiff William Watts was an inmate at the Federal Correctional Institution in Oxford, Wisconsin. In July 2014, FCI Oxford entered into a contract with defendant Brazos Urethane, a roofing and insulation contractor, for Brazos to work on a roofing project at the prison. As part of the project, Brazos would spray polyurethane foam on the roofs of buildings at the prison.

Brazos was responsible for ensuring that the project was conducted safely. Brazos conducts annual safety training with its employees regarding spray polyurethane foam projects, and the company has several health and safety policies related to its operations. For the FCI Oxford project in particular, Brazos employees and Oxford inmates were supposed to be under constant supervision by FCI Oxford personnel for the duration of the project. Before commencing the construction project, Brazos submitted to FCI Oxford a list of chemicals it anticipated using during the project, including GreenBlock Prime 100, a primer that would be applied before the polyurethane insulation.

The material safety data sheet for GreenBlock Prime 100 states that the primer can cause eye irritation. The sheet states that the primer includes limestone, titanium dioxide, carbon black, and crystalline quartz silica, all of which can cause "mechanical irritation" to eyes. Dkt. 120-7 at 5. The sheet also states that the limestone in the primer can cause eye irritation with symptoms of reddening, tearing, stinging, and swelling. *Id.* FCI Oxford approved the list of chemicals submitted by Brazos.

On September 14, 2015, Watts was walking with another inmate from his housing unit to the commissary. He walked past the education building, where Brazos employees were

working on the roof. The education building roof is 28 feet above the west walkway and 30 feet above the east walkway. (It is not clear from the record whether Watts was walking on the east or west walkway.) The roof has a parapet, which is a short wall, surrounding the outer edge of the roof. Watts felt a chemical spray hit his eyes, nose, and mouth. His eyes burned and started to water, and he felt short of breath. Watts continued to the commissary to purchase supplies, and then he returned to his housing unit and flushed his eyes with water for several minutes.

The next day, Watts did not feel well and asked to be seen by medical staff. He was examined by Dr. Gupta, then the medical director at FCI Oxford. Watts reported to Gupta that he had been sprayed in the eyes by a roofing chemical, that his eyes were irritated, and that he had a headache. Gupta examined Watts's eyes and respiratory system. Dkt. 111-2. Gupta noted that Watts's eyes were sensitive to light, but that Watts had no burns or scarring, no changes in his vision, no discharge, no pain, and no redness. He also did not find any problems with Watts's respiratory system. Gupta told Watts to return if his condition worsened. According to Watts, Gupta told him that the roofing spray was called GreenBlock Prime 100, and that it was not dangerous. Watts continued to experience eye problems, and saw Gupta again on November 3 and 16, 2015. Gupta did not find any irregularities or problems with Watts's eyes at those appointments.

In May 2016, Watts saw defendant Mark Kidman, an optometrist who worked at the prison on a contract basis. Watts told Kidman that he had gotten chemicals in his eyes eight months previously, and that he had experienced light sensitivity and dry eyes since then. Kidman's exam of Watts showed normal results, except that Watts's intraocular pressure was near the high end of normal, at 20 mmHg (millimeters of mercury), and that Watts had a large

3

optic nerve cupping both eyes. Dkt. 111-1. Kidman told Watts that the large optic nerve could be normal for Watts, or that it could be an early sign of glaucoma. Kidman scheduled Watts to be seen for a follow-up exam in three months.

Watts saw Kidman again on October 17, 2016. Watts's optic nerves were still enlarged, and Kidman told Watts that the enlarged nerves could be a precursor to glaucoma. But Kidman did not think Watts had glaucoma at the time and he declined to refer Watts to an ophthalmologist. Kidman also told Watts that a chemical roofing spray would not have caused Watts's symptoms. Kidman scheduled Watts for a follow-up in one year. Dkt. 59-2 at 10–11; Dkt. 93 at 5.

Watts saw Kidman again in October 2017. Kidman noted that Watts was experiencing some vision loss, and he referred Watts to an ophthalmologist. Watts saw an ophthalmologist in November 2017, who diagnosed glaucoma and chronic dry eyes and prescribed medication to Watts. Watts's symptoms have improved with medication. Dkt. 111-7.

Brazos eventually completed work on the education building roof without receiving any notice about violations or problems in that area of the project. (Watts says that while he was in a lieutenant's office in 2016 or 2017, he saw a document showing that Brazos had violated OSHA standards and had not taken proper precautions to protect employees from the sealant being applied on the roof. Watts has not submitted the document itself. And Watts's description of the document is inadmissible because he hasn't satisfied any of the conditions in Federal Rule of Evidence 1004, which is the rule that allows testimony about a document's contents under certain conditions. Therefore, I cannot consider Watts's allegations regarding the document.)

Brazos has submitted an expert report from Susan Evans, a certified industrial hygienist, certified safety professional, and civil engineer. Dkt. 123-1. Evans gives the opinion that Brazos was not responsible for Watts's eye injuries for four reasons. First, Brazos was not required by contract to take any specific action when inmates were walking near a work area. Second, Brazos is experienced in spray foam roofing and it has an established safety program and safety training. Third, GreenBlock Prime 100 was applied to the education building roof in a manner that would not have exposed Watts or other individuals walking below the building to hazardous concentrations of the primer. The closest Watts could have been to the spray is 28 feet, assuming he was walking on the west walkway. But the largest "work exclusion zone" required for safety purposes on the project was 25 feet, meaning that Brazos had determined that a person had a low risk of exposure to hazardous chemicals if the person was beyond 25 feet from the point of spray. And, the 25-feet work exclusion zone was based on the polyurethane spray foam insulation, which has higher concentrations of hazardous materials than GreenBlock Prime 100. So a person more than 25 feet from the education building had an even smaller risk of significant exposure to hazardous materials from GreenBlock Prime 100. *Id.* at 5–6. In addition, there would have been little overspray from the primer, if any, that would not have been blocked by the parapet wall. *Id.* at 5. Fourth, GreenBlock Prime 100 as applied to the education building roof is not associated with any eye damage, other than mechanical abrasion, as may occur with dust in eyes. GreenBlock Prime 100 is not associated with glaucoma. *Id.*

ANALYSIS

**A. Dr. Kidman**

Watts was granted leave to proceed on Eighth Amendment and negligence claims against defendant Dr. Kidman. Dkt. 13.

**1. Eighth Amendment claim**

Watts should not have been granted leave to proceed with an Eighth Amendment claim against Kidman. Watt's Eighth Amendment claim was brought under *Bivens v. Six Unknown Fed Narcotics Agents*, 403 U.S. 388 (1971). In *Bivens*, the Supreme Court recognized that claimants may assert a cause of action for damages caused by federal agents. But the Court has declined to extend that liability to persons or entities who are not federal agents. In *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001), the Supreme Court refused to make individual private entities liable for damages sought in a *Bivens* action. And in *Minneci v. Pollard*, 565 U.S. 118 (2012), the Supreme Court extended its holding in *Malesko*, ruling that a prisoner could not assert an Eighth Amendment *Bivens* claim against the employees of the private prison company which incarcerated him. Applying these Supreme Court cases, lower courts have concluded that plaintiffs cannot sue private individuals under *Bivens*, even if the individual was acting under a federal contract. *See, e.g.*, *Holz v. Terre Haute Reg'l Hosp.*, 123 F. App'x 712, 713 (7th Cir. 2005) (" A *Bivens* claim cannot be brought against a private entity (or individual), even if it is a federal contractor."); *O'Neil v. Anderson*, 372 Fed. App'x 400 (4th Cir. 2010) )(affirming dismissal of Bivens action against a private doctor that was contracted to provide medical care to a federal prison); *Medina v. United States*, No. 19-CV-1163-JPS, 2020 WL 263515, at *2 (E.D. Wis. Jan. 17, 2020) ("A *Bivens* claim is not appropriate against a private individual."); *Boston v. Bennett*, 2018 WL 7078678, * 7 (N.D.W. Va. Dec. 26, 2018)(dismissing *Bivens* claim against dentist,

6

who was a contract employee providing dental care to an inmate); *Valdez v. Bureau of Prisons*, No. A-16-CV-695-LY, 2017 WL 3526672, at *3 (W.D. Tex. Aug. 16, 2017) (dismissing *Bivens* action against private podiatrist contracted to provide podiatry services to federal inmates).

In this instance, Watts has attempted to sue Kidman for Eighth Amendment violations under *Bivens*. But Kidman is a private optometrist who had contracted with FCI Oxford to treat inmates. Watts is not a federal agent, and the court has no authority to allow a *Bivens* action against such a defendant. Therefore, Watts's Eighth Amendment claim against Kidman must be dismissed.

### 2. Jurisdiction

Watts's Eighth Amendment claim against Kidman was Watts's only federal claim in this case. Having dismissed Watts's only federal claim, I must determine whether to retain jurisdiction over Watts's state-law claims against Kidman and Brazos Urethane. Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits. 28 U.S.C. § 1367(c); *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010). But a district court is never required to relinquish jurisdiction over state law claims merely because the federal claims were dismissed before trial. *Id.*

I will retain jurisdiction over Watts's state law claims for three reasons. First, this case has been pending for more than two-and-a-half years. Resolution of the case will serve the interests of justice, the parties, and judicial economy. Second, as discussed below, Watts's negligence claims are straightforward and do not require any analysis of complicated or novel state law issues. Third, the parties have not submitted evidence regarding their citizenship or domicile, but it may be that this court would have subject matter jurisdiction over some or all

of Watts's claims under 28 U.S.C. § 1332. Rather than wait to receive that information from the parties, I will simply address Watt's negligence claims.

### 3. Negligence

To prevail on his negligence claim against Kidman, Watts must prove that Kidman breached his duty of care and that Watts suffered an injury as a result. *See Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865. Wisconsin law more specifically defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999). This means that Watts has to show that Kidman failed to use the required degree of skill exercised by an average optometrist under the circumstances, that Watts suffered harm, and that there is a causal connection between Kidman's failure to conform to the standard of care and Watts's harm. *See Carney-Hayes v. Nw. Wisconsin Home Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 81–82, 699 N.W.2d 524, 537; Wis J–I Civil 1023.

Watts contends that Kidman failed to meet the standard of care by failing to respond appropriately to Watts's symptoms of dry eyes, high intraocular pressure, and a large optic nerve. Watts argues that Kidman should have provided Watts with some kind of treatment for dry eyes and possible glaucoma, or that Kidman should have referred Watts to an ophthalmologist sooner. Kidman responds that Watts has submitted no evidence from which a jury could conclude that Kidman's actions fell below the standard of care or injured Watts.

I agree with Kidman. Under Wisconsin law, expert testimony is required to establish the standard of care, unless the situation is one in which common knowledge affords a basis

for finding negligence. *Carney-Hayes*, 2005 WI 118, ¶ 37 ("Medical malpractice cases require expert testimony to establish the standard of care."); *Sheahan v. Suliene*, Case No. 12-cv-433-bbc, 2014 WL 1233700, at *9 (W.D. Wis. 2014). An ordinary lay jury would not know whether Kidman's decision to monitor Watts's eye condition, rather than provide specific treatment or refer Watts to a specialist, fell below the standard of care for a reasonable optometrist faced with Watts's symptoms and test results. Nor would an ordinary jury know, without expert assistance, whether Kidman's wait-and-see approach worsened Watts's condition.

Watts cites excerpts from *Johns Hopkins Family Health Book* regarding eye injuries, particularly chemical injuries, as evidence that Kidman should have responded differently to Watts's symptoms. The information from this book is general information about eye injuries and the treatment of eye injuries. But it does not show how Kidman should have responded to Watts's specific situation. Kidman had to use medical judgment to evaluate Watts's symptoms; nothing in the book speaks to that. I note that the material safety data sheet for GreenBlock Prime 100 says that its ingredients pose a risk of *mechanical* irritation, not *chemical* irritation. So the statement that Watts highlights that chemical injury to the eye may lead to glaucoma does not connect GreenBlock Prime 100 to Watts's glaucoma. *See* Dkt. 126-8, at 4.

Watts says that he tried to find an expert but was unable to do so. He had asked the court on several occasions to appoint counsel, and he also requested that the court appoint a neutral expert. He renews his request that the court recruit counsel for him. Dkt. 115. I am sympathetic to Watts's situation. It is extremely difficult for pro se and incarcerated individuals to find counsel or an expert on their own. But it is also difficult for the court to find lawyers or experts willing and able to work on these types of cases. As I explained in previous orders

denying Watts's requests for assistance in recruiting counsel, the court must consider whether the legal and factual difficult of a case exceeds the litigant's ability to prosecute it. *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007). Watts has demonstrated throughout this case that he is capable of gathering and presenting evidence and applying that evidence to legal principles. I am not persuaded that I should have recruited counsel in this case.

I recognize that Watts, like most pro se litigants, would be unable to get an expert to support his case if he is not represented by counsel. I explained in an earlier order, Dkt. 98, why it would not be appropriate for the court to appoint a neutral expert under Rule 706 of the Federal Rules of Evidence. Watts needed an expert witness to support his own case, but the court does not appoint an expert to help one side prepare his case. *See Dobbey v. Carter*, 734 F. App' x 362, 364–65 (7th Cir. 2018) ("But Federal Rule of Evidence 706 allows appointment of an expert witness if necessary to help the court understand the issues, not to assist a party in preparing his case."); *DeJesus v. Godinez*, 720 F. App'x 766, 772 (7th Cir. 2017) ("But Rule 706 is used to appoint a neutral expert to interpret complex information for the trier of fact, not to represent the interests of one party.").

If Watts had convinced me that, with the help of an expert, Watts might have a viable claim against Kidman, I would consider attempting to recruit counsel for Watts. The need for expert testimony factors heavily in my consideration for requests for counsel. But I cannot recruit counsel in every case in which a pro se litigant makes a claim that might require expert evidence. If I took that approach, I would have to recruit counsel for nearly every case involving a prisoner's allegation of medical negligence. Dozens, probably hundreds, of such cases are filed in this court every year. The court could not possibly find volunteer counsel for every one of them.

Watts has failed to adduce evidence that Kidman acted negligently in his treatment of Watts, so Kidman is entitled to summary judgment.

## B. Brazos Urethane

Watts is also proceeding on a negligence claim against Brazos Urethane. He contends that Brazos acted negligently by failing to take proper precautions to protect inmates during the roofing project. Brazos has moved for summary judgment, arguing that Watts has failed to show that Brazos breached a duty of care or acted negligently with regard to its work on the construction project or that Brazos's purported negligent conduct caused Watts's glaucoma or other symptoms.

Watts's negligence claim against Brazos has the same general elements as his claim against Kidman. Watts must show that Brazos breached its duty of care and that Watts suffered an injury as a result. *See Paul*, 2001 WI 42, ¶ 17. Watts argues that Brazos breached its duty of care by failing to cease spraying primer on the roof during inmate movement and by failing to take more precautions to prevent overspray from reaching inmates walking below the project.

In Wisconsin, every person has a duty to use ordinary care and to refrain from acts that unreasonably threaten the safety of others. *Antwaun A. ex rel. Muwonge v. Heritage Mut. Ins. Co.*, 228 Wis. 2d 44, 55, 596 N.W.2d 456, 461 (1999). Whether the ordinary duty of care has been breached turns on the reasonableness of an action and the foreseeability of injury under the circumstances. *Id.* at 55, 596 N.W.2d 456, 461. A person breaches the duty of ordinary care if he or she, "without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury." *Alvarado v. Sersch*, 2003 WI 55, ¶ 14, 272 Wis. 2d 74, 662 N.W.2d 350 (citing Wis. JI-CIVIL 1005).

11

Watts has not submitted any evidence showing what steps Brazos could have taken that would have protected inmates, such as himself, from being sprayed by primer or other roofing chemicals. Perhaps Brazos could have coordinated better with FCI Oxford officials about when inmates would be moving below the project area. Or perhaps Brazos could have erected a physical barrier around the roof while spraying to prevent overspray from reaching inmates below. But Watts does not cite any admissible evidence that Brazos actually did anything carelessly. The fact that Watts was hit by overspray does not, by itself, show any negligence by Brazos.

I agree with Brazos that Watts would need expert testimony to show that Brazos's failure to take additional steps to protect inmates amounted to a breach of its duty of care to Watts. A negligence claim premised on a defect in Brazos's safety precautions would fall outside a juror's common knowledge. Expert testimony would be required to assess the proper safety precautions that should have been taken in light of the chemicals used, the location of the buildings in reference to the walkways, and inmate traffic, among other considerations. Brazos's expert gave the opinion that Brazos's precautions met the standard of care because Brazos was not required by contract to monitor inmate movement; Brazos had safety protocols and its employees received safety training for spray foam roofing projects; Brazos used work zone exclusions to protect bystanders from hazardous overspray; and GreenBlock Prime 100 is not known to cause the type of injuries alleged by Watts. Dkt. 123-1. Thus, the injury that Watts alleges to have suffered—long-lasting irritation and glaucoma—was not foreseeable to Brazos. Watts would need expert testimony to refute these opinions. *See Lees v. Carthage Coll.*, 714 F.3d 516, 522 (7th Cir. 2003) ("Where all the specifics of a defendant's duty of care involve specialized knowledge, plaintiffs must introduce expert testimony to establish this element of

a negligence claim."); *Ledford v. Baenen*, No. 16-CV-665-JPS, 2019 WL 1412601, at *13 (E.D. Wis. Mar. 28, 2019) ("[T]he standard of care on construction sites is beyond the knowledge of the ordinary citizen, and an expert would be needed to opine whether following general OSHA protocols about site safety . . . is sufficient to meet the standard of care."); *Atl. Specialty Ins. Co. v. United States*, 2017 WL 3822057, at *5–6 (W.D. Wis. Aug. 30, 2017) (holding that a plaintiff's claim failed as a matter of law where he offered no expert testimony regarding the proper placement of drainage basins in a parking lot).

Watts also has not submitted evidence from which a jury could conclude that Brazos's purported negligent actions caused the injuries he suffered, beyond the initial burning eyes and shortness of breath. Watts has admitted that the medical professionals treating him did not think his eye problems were caused by exposure to a chemical. Without expert opinion, a jury could not conclude that Watts's alleged exposure to GreenBlock Prime 100 caused ongoing dry eyes or glaucoma.

Again, if Watts had persuaded me that he might have a viable claim against Brazos if only he could get an expert, I would consider recruiting counsel for him. But I am not persuaded that Watts's case, among the many for which counsel is requested, warrants the recruitment of volunteer counsel.

For all of these reasons, Watts's negligence claim against Brazos fails. Therefore, I will grant summary judgment to Brazos and close this case.

ORDER

IT IS ORDERED that:

1. Plaintiff William M. Watts's motion for assistance in recruiting counsel, Dkt. 115, is DENIED.

2. Defendant Mark Kidman's motion for summary judgment, Dkt. 103, and defendant Brazos Urethane Inc.'s motion for summary judgment, Dkt. 117, are GRANTED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered October 5, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge